# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-21-00286-CV

**Austin Independent School District, Appellant**

**v.**

**Rodney Anderson, Appellee**

### FROM THE 53RD DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-GN-19-004070, THE HONORABLE AMY CLARK MEACHUM, JUDGE PRESIDING

### M E M O R A N D U M   O P I N I O N

Following termination of his employment, Rodney Anderson filed suit against his former employer, Austin Independent School District (AISD), under the Texas Whistleblower Act, *see* Tex. Gov't Code §§ 554.002-.010, and the Texas Commission on Human Rights Act (TCHRA), *see* Tex. Lab. Code §§ 21.051-.061. AISD filed a plea to the jurisdiction, supported by evidence, which the trial court denied. In this interlocutory appeal, AISD asserts that the trial court erred in denying its plea because it is protected from suit by governmental immunity and because Anderson failed to assert a claim for which immunity is waived. *See* Tex. Civ. Prac. & Rem. Code § 51.014(a)(8). Because we conclude that the allegations in Anderson's pleadings and the jurisdictional evidence are insufficient to support a waiver of immunity under either the Whistleblower Act or the TCHRA, we reverse the trial court's order and render judgment dismissing the suit for lack of jurisdiction.

**BACKGROUND**

Anderson was hired as a police officer by AISD in its Police Department in 1995 and was promoted to sergeant in 2004 and to lieutenant in 2010. From 2012 until his termination in 2019, Anderson's direct supervisor was Interim Chief, later Assistant Chief, Chris Envoy.

On March 4, 2018, Anderson sent an anonymous letter to the AISD Board of Trustees in which he complained about the "current leadership within the District and [the] Department" and, specifically, their handling of a terroristic threat received at Akins High School in February 2018. In his letter, Anderson claimed that internal policies and procedures were not followed during the incident response and that "the chaos that ensued" was "a direct result of a lack of training for line officers, lack of proper resources, and the lack of experience of the first line supervision level."

Anderson also complained in his anonymous letter to the Board about poor morale in the Police Department due to conduct by one of his colleagues, Sergeant David Herrera. According to Anderson's letter, the Department failed to adequately discipline Herrera after learning that he had "slapped and used extreme language" toward a student. Anderson further stated that Herrera had been accused of sexually harassing another officer and that due to "the treatment from Chief Envoy, Lieutenant Barrera, and the staff in human resources," the officer resigned. Anderson did not, however, provide any details as to the harassing conduct that Herrera had been accused of committing. On April 16, 2018, Anderson sent a formal grievance to the Board's outside legal counsel, in which he recited his complaints about the handling of the terroristic threat and lack of leadership but omitted his complaints about Sergeant Herrera.

According to the allegations in his live pleadings before the trial court, Anderson also reported issues concerning Sergeant Herrera directly to Assistant Chief Envoy. Specifically,

2

in June 2017, Anderson orally informed Envoy that Herrera had been seen sleeping while on duty. In addition, in January 2019, he orally informed Envoy that Herrera may have improperly worked overtime duty while on leave under the Family and Medical Leave Act (FMLA). Envoy responded to Anderson's oral report about improper overtime by requesting that he send a follow-up e-mail summarizing what he knew about the situation.

In compliance with Assistant Chief Envoy's request, on January 4, 2019, Anderson sent an e-mail to Envoy, stating that "he was made aware that [Sergeant Herrera] was possibly working off-duty assignments at the Long Center and the Junior League" while on FMLA leave and that he was "bringing this to [Envoy's] attention for further review and or investigation." In response to the e-mail, Envoy informed Anderson that he should submit a formal complaint to initiate an internal affairs investigation. On January 7, 2019, Anderson submitted a sworn complaint alleging that Herrera "was possibly working off-duty assignments . . . while off on FMLA," although he was "not sure of the dates or times of the possible policy violations." Following an investigation, the Department determined that Anderson's allegations were unsubstantiated and dismissed his complaint.

On January 18, 2019, Sergeant Herrera filed a grievance against Anderson, complaining that Anderson had harassed him by improperly sharing his disciplinary history and threatening his work status. The matter was assigned to an investigator, attorney Rachael Maresh. During the course of the investigation, Herrera reported to Maresh that Anderson had retaliated against him for filing the grievance by removing him from an overtime assignment at a baseball tournament scheduled for March 1, 2019. Maresh incorporated Herrera's retaliation complaint into her ongoing investigation of his harassment complaint.

Through her investigation, Maresh learned that although Anderson was not Sergeant Herrera's supervisor, he was in charge of scheduling overtime assignments for the Police Department. When questioned by Maresh, Anderson denied that he removed Herrera's overtime assignment because Herrera had filed a grievance against him. Anderson explained that, in error, he had "double booked" Herrera and another officer, Officer Thompson, for the same shift and that he removed Herrera's assignment to correct the error. Conversely, Thompson told Maresh that he had signed up for the morning shift and Sergeant Herrera had signed up for the afternoon shift, but that Anderson later told Thompson to work the full day instead.

On April 5, 2019, Maresh reported her findings from her investigation on Sergeant Herrera's grievance against Anderson in a written executive summary. According to the summary, Maresh determined that "there was insufficient evidence to find by a preponderance of the evidence that prohibited harassment [by Anderson against Herrera] had occurred." She also concluded, however, that "based on the information and documentation provided by the interviewees, the preponderance of the evidence supports a finding that Lieutenant Anderson retaliated against Sergeant Herrera for filing his DIA (Local) complaint by removing him from an overtime duty." Maresh reported, "Lt. Anderson's explanation of the duty assignment correction and deleting an extra duty on top of a full-duty was not corroborated by any other interviewees involved with this allegation," and "no one recalled there being a full day shift on the schedule originally for the . . . baseball tournament."

AISD human resources officials then met with Anderson, informed him of the results of Maresh's investigation, and placed him on administrative leave. AISD Chief of Police, Ashley Gonzalez, then recommended that the district terminate Anderson's employment,

4

which the Superintendent approved. Anderson was terminated from his employment effective April 10, 2019.

On July 15, 2019, Anderson filed suit against AISD, alleging that AISD violated the TCHRA because it "discriminated and retaliated against [him] because of his race . . . and because of his opposition to unlawful employment practices." Anderson also claims that in violation of the Whistleblower Act, AISD "discriminated and retaliated against [him] . . . because he made good faith reports of violations of law committed by AISD and its employees to appropriate law enforcement authorities."

In response to the suit, AISD filed a plea to the jurisdiction on the ground that it is protected from suit by governmental immunity and that Anderson had failed to establish a valid waiver of immunity under either the Whistleblower Act or the TCHRA. In support of its plea, AISD attached Anderson's deposition testimony and exhibits, along with sworn declarations from Assistant Chief Envoy and Chief Gonzalez. In their declarations, Envoy and Gonzalez generally described a series of incidents that, in their view, demonstrated "performance deficiencies" and led to the decision to recommend termination of Anderson's employment. According to Gonzalez's declaration, the "final straw" occurred when he received Maresh's executive summary, concluding that Anderson had retaliated against Herrera for filing a grievance.

Anderson filed a response to the plea to the jurisdiction, reciting portions of his petition, asserting that he had "properly invoked the jurisdiction of the court," and attaching his own sworn declaration. Following a hearing, the trial court denied AISD's plea, and this appeal followed.

**STANDARD OF REVIEW**

A plea to the jurisdiction is procedural mechanism "through which a party may challenge a trial court's authority to decide the subject matter" of a claim. *Texas Dep't of State Health Servs. v. Balquinta*, 429 S.W.3d 726, 737 (Tex. App.—Austin 2014, pet. dism'd). Because whether a court has subject-matter jurisdiction is a question of law, we review de novo a trial court's ruling on a plea to the jurisdiction. *Texas Dep't of Parks & Wildlife v. Miranda*, 133 S.W.3d 217, 225 (Tex. 2004).

A plea to the jurisdiction may challenge whether the plaintiff has alleged facts that affirmatively demonstrate a court's jurisdiction to hear the case, the existence of those very jurisdictional facts, or both. *Texas Dep't of Transp. v. Lara*, 625 S.W.3d 46, 52 (Tex. 2021). When the jurisdictional plea challenges the pleadings, we determine whether the plaintiff's pleadings allege facts affirmatively demonstrating subject-matter jurisdiction. *Miranda*, 133 S.W.3d at 226. In making this assessment, we construe the plaintiff's pleadings liberally, taking all assertions as true, and look to the plaintiff's intent. *Texas Dep't of Crim. Justice v. Rangel*, 595 S.W.3d 198, 205 (Tex. 2020). If the pleadings affirmatively negate the existence of jurisdiction, the plea may be granted without affording the plaintiff an opportunity to replead. *Miranda*, 133 S.W.3d at 226.

When the plea challenges the existence of jurisdictional facts, we must move beyond the pleadings and consider evidence when necessary to resolve the jurisdictional issues. *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 770 (Tex. 2018); *Bland Indep. Sch. Dist. v Blue*, 34 S.W.3d 547, 554-55 (Tex. 2000). When those challenged jurisdictional facts also implicate the merits of the plaintiff's claim, as in this case, the plaintiff's burden mirrors that of a traditional summary judgment. *Lara*, 625 S.W.3d at 46 (quoting *Mission Consol. Indep.*

*Sch. Dist. v. Garcia*, 372 S.W.3d 629, 634 (Tex. 2012)). Consequently, we review the relevant evidence in the light most favorable to the plaintiff to determine whether a genuine issue of material fact exists. *Town of Shady Shores v. Swanson*, 590 S.W.3d 544, 550 (Tex. 2019) (citing *Miranda*, 133 S.W.3d at 226). If the evidence creates a fact question regarding the jurisdictional issue, then the trial court cannot grant the plea to the jurisdiction, and the fact issue will be resolved by the fact finder. *Miranda*, 133 S.W.3d at 227-28. But if the relevant evidence is undisputed or does not raise a fact question on jurisdiction, we rule on the plea as a matter of law. *See id.* at 228.

Sovereign immunity generally bars suits against the State or its agencies, absent a clear and unambiguous waiver of immunity by the legislature. *Nazari v. State*, 561 S.W.3d 495, 500 (Tex. 2018). Under the doctrine of governmental immunity, political subdivisions of the state, including school districts, share the state's immunity when performing governmental functions as the state's agent. *Rosenberg Dev. Corp. v. Imperial Performing Arts, Inc.*, 571 S.W.3d 738, 747 (Tex. 2019). Therefore, like sovereign immunity, governmental immunity implicates a court's subject-matter jurisdiction and may be asserted through a plea to the jurisdiction or other procedural vehicle, such as a motion for summary judgment. *Alamo Heights*, 544 S.W.3d at 770. When a governmental defendant challenges jurisdiction on the basis of immunity, the plaintiff's burden of affirmatively demonstrating jurisdiction includes establishing a waiver of immunity. *Swanson*, 590 S.W.3d at 550.

Both the Whistleblower Act and the TCHRA, the statutes upon which Anderson's claims are based, operate as waivers of governmental immunity to the extent the governmental entity is liable under the statute. *See* Tex. Gov't Code § 554.0035 (waiver of immunity under Whistleblower Act); *University of Hous. v. Barth*, 403 S.W.3d 851, 854 (Tex. 2013) (noting that

"elements of a claim under the Whistleblower Act are jurisdictional and may not be waived"); *Garcia*, 372 S.W.3d at 629 (explaining that TCHRA waives immunity when plaintiff "actually states a claim for conduct that would violate the [TCHRA]"). In its jurisdictional plea, AISD challenged both the sufficiency of Anderson's pleadings and the existence of jurisdictional facts, with supporting evidence. Thus, our ultimate inquiry is whether the pleaded and unnegated facts presented by Anderson, taken as true and liberally construed with an eye to the pleader's intent, affirmatively demonstrate a claim within the scope of the Whistleblower Act or the TCHRA. *See Brantley v. Texas Youth Comm'n*, 365 S.W.3d 89, 94 (Tex. App.—Austin 2011, no pet.).

## DISCUSSION

On appeal, AISD asserts that the trial court erred in denying its plea because, in its view, the undisputed factual allegations in Anderson's pleadings and the jurisdictional evidence affirmatively negate the existence of a valid waiver of governmental immunity under both the Whistleblower Act and the TCHRA. In reviewing the trial court's jurisdictional ruling, we will first examine whether Anderson met his burden to demonstrate a valid waiver of immunity under the Whistleblower Act and then examine whether he met his burden as to his discrimination and retaliation claims under the TCHRA.

**The Whistleblower Act**

*Background Law*

When a trial court's jurisdiction is premised on a violation of the Whistleblower Act, the plaintiff meets his burden of affirmatively demonstrating jurisdiction by alleging facts or, when necessary, producing evidence of facts sufficient to show that (1) he was a public employee; (2) he made a good-faith report of a violation of law by his employing governmental

8

entity or another public employee; (3) the report was made to an appropriate law-enforcement authority, and (4) he was subject to an adverse personnel action, such as suspension or termination, because of the report. *Texas Dep't of Crim. Justice v. McElyea*, 239 S.W.3d 842, 849 (Tex. App.—Austin 2007, pet. denied); *see* Tex. Gov't Code § 554.002(a).

In its plea to the jurisdiction, and now on appeal, AISD does not dispute that Anderson was a public employee, that he reported conduct by his employer or another public employee, and that he suffered an adverse personnel action. Instead, AISD argues that Anderson failed to meet his burden to demonstrate a waiver of immunity as to the second and third elements of a Whistleblower Act claim because his pleadings and the jurisdictional evidence affirmatively negate the possibility that any report made by Anderson qualifies as "a good faith report of a violation of law" to "an appropriate law[-]enforcement authority," as those terms are used in the Act.

Section 554.002 of the Whistleblower Act defines "appropriate law[-]enforcement authority":

> [A] report is made to an appropriate law[-]enforcement authority if the authority is part of a state or local governmental entity or the federal government that the employee in good faith believes is authorized to: (1) regulate under or enforce the law alleged to be violated in the report; or (2) investigate or prosecute a violation of criminal law.

Tex. Gov't Code § 554.002(b). As a result, an employee seeking protection under the Whistleblower Act must prove that "the report was made to an appropriate law-enforcement authority, or that the employee had a good-faith belief that it was." *Texas Dep't of Human Servs. v. Okoli*, 440 S.W.3d 611, 614 (Tex. 2014). The issue of whether an employee has made a report in "good faith" to an appropriate law-enforcement authority has both subjective and objective

9

elements. *University of Tex. Sw. Med. Ctr. v. Gentilello*, 398 S.W.3d 680, 683 (Tex. 2013). To establish "good-faith" as it relates to an appropriate law-enforcement authority, the employee must show that (1) he believed that the reported-to authority was authorized (a) to regulate under or enforce the law alleged to be violated in the report, or (b) to investigate or prosecute a violation of criminal law; and (2) his belief was reasonable in light of his training and experience. *See Okoli*, 440 S.W.3d at 614.

"An authority's power to discipline its own or investigate internally does not support a good-faith belief that it is an appropriate law-enforcement authority." *McMillen v. Texas Health & Human Servs. Comm'n*, 485 S.W.3d 427, 429 (Tex. 2016) (per curiam) (citing *Gentilello*, 398 S.W.3d at 686); *see Texas Comm'n on Envt'l Quality v. Resendez*, 450 S.W.3d 520, 523 (Tex. 2014) (per curiam) ("Internal-compliance authority, however, cannot support a good-faith belief that [reported-to authority] had the power to enforce the Government Code's fraud-reporting provisions or to pursue criminal charges.") Instead, the reported-to authority must possess "outward-looking powers," *McMillen*, 485 S.W.3d at 429, and "reports up the chain of command" are generally insufficient, *Okoli*, 440 S.W.3d at 614. In other words, to constitute an appropriate law-enforcement authority under the Act, the reported-to authority must have the power to enforce, investigate, or prosecute violations of law against third parties outside of the entity itself, or it must have the power to promulgate regulations governing the conduct of third parties. *Gentilello*, 398 S.W.3d at 686.

In addition, because Section 554.002(b) describes "an appropriate law[-] enforcement authority" in terms of having certain authority in relation to "the law alleged to be violated in the report" or "a violation of criminal law," the particular law that the employee reported was violated is critical to the determination of whether the report was made to an

appropriate law-enforcement authority. *Texas Dep't of Transp. v. Needham*, 82 S.W.3d 314, 320 (Tex. 2002); *Resendez*, 450 S.W.3d at 523 (concluding that report of criminal violations to state senator's office was insufficient to support claim under Act because senator's investigatory powers were not prosecutorial). With these principles in mind, we consider the reports made by Anderson as alleged in his pleadings.

### *Reports made to the AISD Board of Trustees*

Liberally construing the allegations in Anderson's pleadings and viewing those allegations in the light most favorable to him, the reports that are the basis of Anderson's Whistleblower Act claim were made to the AISD Board of Trustees (in his March 2018 letter) and, separately, to Assistant Chief Envoy. The reported "violations of law" made to the Board, as alleged by Anderson and reflected in his March 2018 letter are that (1) Sergeant Herrera "slapp[ed] a handcuffed student and us[ed] extreme language" toward a student in detention, "in violation of the Penal Code, § 22.04 and AISD Policy No. 1.02.B.2 and 1.02.B.28"; (2) Herrera sexually harassed a subordinate, in violation of the Texas Labor Code, Chapter 21; and (3) Assistant Chief Envoy, other police officers, and the AISD superintendent violated various AISD policies in their "mishandling of a February 22, 2018 terroristic threat."

We conclude that the factual allegations in Anderson's pleadings and the relevant jurisdictional evidence fail to raise a fact issue regarding whether any of these reports, qualify as reports made to an "appropriate law [-]enforcement authority" under the Whistleblower Act. *See* Tex. Gov't Code § 554.002(b). Anderson does not allege, nor is there any evidence suggesting, that the Board has any authority to "investigate or prosecute" criminal offenses. *See id.* (governmental authority is "appropriate law[-]enforcement authority if . . . the employee in

11

good faith believes [the authority] is authorized to . . . investigate or prosecute a violation of criminal law"). In addition, neither the allegations nor the evidence show that the Board has any authority to "regulate under or enforce" any of the allegedly violated laws (i.e., the Penal Code, the Labor Code, or AISD policies) outside of AISD, against third parties. *See id.* (governmental authority is "appropriate law[-]enforcement authority if . . . the employee in good faith believes [the authority] is authorized to . . . . regulate under or enforce the law alleged to be violated in the report"). At best, the Board is responsible for internal compliance with its own policies and with the laws cited by Anderson. *See Resendez*, 450 S.W.3d at 523 (internal-compliance authority is insufficient to establish status as appropriate law-enforcement authority). Moreover, given his expertise and training, Anderson could not have reasonably believed that the Board of Trustees possessed the authority to regulate under or enforce any of the cited-to laws against third parties, outside of the school district. *See Okoli*, 440 S.W.3d at 614. Therefore, to the extent Anderson relies on his March 2018 letter to the Board to support his Whistleblower claim, we conclude that the Board is not an "appropriate law-enforcement authority," within the meaning of the Act.

### *Reports made to Assistant Chief Envoy*

Turning to the reports that Anderson alleges he made to Assistant Chief Envoy, the reported "violations of law" are that Sergeant Herrera (1) was "sleeping on the job, in violation of [the Texas] Penal Code, Chapter 31"; and (2) worked overtime duty while on leave under the Family and Medical Leave Act (FMLA), "in violation of AISD Policy No. 3.09.A.2."

As to his report that Herrera was improperly working while on FMLA leave, Anderson does not allege and the evidence does not suggest that the AISD Police Department has any "outward-looking powers" to regulate or enforce the FMLA or AISD Policy regarding

12

use of FMLA leave. *See McMillen*, 485 S.W.3d at 429. In addition, Anderson does not allege that working while on FMLA is a violation of criminal law, and we are not aware of any criminal law prohibiting such work. Finally, given his expertise and training, Anderson could not have reasonably believed that the Department possessed the authority to regulate under or enforce either the FMLA or AISD Policy outside of the district. *See Okoli*, 440 S.W.3d at 614. Consequently, the factual allegations in Anderson's pleadings, taken as true, and the jurisdictional evidence, viewed in the light most favorable to Anderson, fail to show that he believed in good faith that Assistant Chief Envoy or the Department was authorized (1) to regulate under or enforce, outside of the district, the FMLA or AISD Policy, or (2) to investigate or prosecute a violation the FMLA or AISD Policy as a violation of criminal law. *See id.* Therefore, to the extent Anderson relies on his FMLA-leave report to support his Whistleblower claim, we conclude that Assistant Chief Envoy is not an "appropriate law-enforcement authority," within the meaning of the Act.

To the extent Anderson relies on his report to Assistant Chief Envoy that Herrera violated Chapter 31 of the Penal Code, however, we recognize that the Police Department within AISD is authorized to conduct criminal investigations within its jurisdiction. As previously discussed, "appropriate law-enforcement authority" includes a governmental authority "that the employee in good faith believes is authorized to . . . investigate or prosecute a violation of criminal law." Tex. Gov't Code § 554.002(b). Consequently, reports to the Department of violations of criminal law—including violations committed by the Department's own employees—may qualify as reports of "violations of law" to an "appropriate law[-]enforcement authority." *Gentilello*, 398 S.W.3d at 686 (noting that "[a] police department employee could retain the protections of the Whistleblower Act if she reported that her partner [was engaging

in criminal narcotics activity] to her supervisor in narcotics or internal affairs division"); *see also Okoli*, 440 S.W.3d at 616 (explaining that internal report of violation of criminal law to police could be protected under Act). Therefore, whether Anderson has demonstrated a valid Whistleblower Act claim as it relates to his report that Herrera was sleeping on the job, turns on whether such conduct constitutes "a violation of criminal law," as that phrase is used in the Act. *See* Tex. Gov't Code § 554.002(b).

Liberally construed, Anderson alleges that Herrera's sleeping while on duty constitutes theft under Chapter 31 of Penal Code because, presumably, he received payment for work or services not actually performed. Like the definition of "appropriate law[-]enforcement authority," the "violation of law" element incorporates a good-faith standard. That is, a plaintiff is protected by the Whistleblower Act when, in "good faith," he reports a violation of law. *City of Elsa v. Gonzalez*, 325 S.W.3d 622, 626 (Tex. 2010) (per curiam). Consequently, to prevail on his Whistleblower Act claim Anderson must show that he believed that Herrera's sleeping while on duty constituted a violation of law and his belief must have been reasonable based on his training and experience. *See id.*

Chapter 31 of the Penal Code does not expressly criminalize sleeping during work or even while on police duty. Instead, Section 31.02 provides that "[a] person commits an offense if he unlawfully appropriates property with intent to deprive the owner of property." Tex. Penal Code § 31.02. Nothing in the facts as alleged in Anderson's pleadings or the evidence presented suggests that Herrera, by sleeping, intended to deprive AISD of its property. *See Griffin v. State*, 614 S.W.2d 155, 159 (Tex. Crim. App. 1981) ("Intent to deprive must be determined from the words and acts of the accused."); *see also* Tex. Penal Code § 31.01 ("[F]ailure to perform the promise in issue without other evidence of intent or knowledge is

14

not sufficient proof that the actor did not intend to perform."). Moreover, in his deposition testimony, Anderson was asked whether he believed that he was reporting a violation of law when he reported Herrera's sleeping to Envoy. In response, Anderson stated that he did not know if it was a violation of law but that he knew it was against Department policy. Anderson was then asked whether based on his experience and training, he would refer a report of an employee sleeping on the job to the district attorney for prosecution. Anderson replied that he would not, and he agreed that it would have been frivolous to do so.

The undisputed evidence presented by AISD in support of its plea affirmatively demonstrates that Anderson did not subjectively believe that Herrera's sleeping constituted theft under the Penal Code and that, objectively, it would have been unreasonable for Anderson to believe that Herrera's sleeping while on duty constituted theft. Consequently, Anderson's report that Herrera was sleeping while on duty, even if true, is not a good-faith report of a violation of criminal law.

In summary, the undisputed allegations in Anderson's pleadings and the pertinent jurisdictional evidence, viewed in the light most favorable to Anderson, affirmatively demonstrate that none of the reports that are the basis of Anderson's Whistleblower claim qualify as "a good faith report of a violation of law" to "an appropriate law[-]enforcement authority," within the meaning of the Whistleblower Act. Because Anderson failed to meet his burden to demonstrate a valid waiver of immunity under the Act, the trial court erred in denying AISD's plea to the jurisdiction as to this claim.

15

**Texas Commission on Human Rights Act**

### *Background Law*

The TCHRA provides that an employer commits an unlawful employment practice if because of "race, color, sex, national origin, religion, age, or disability" the employer "fails or refuses to hire an individual, discharges an individual, discriminates in any other manner against an individual in connection with compensation or the term, conditions, or privileges of employment." Tex. Lab. Code § 21.051(1). In addition, the Act prohibits an employer from retaliating against an employee for engaging in certain protected activities, including "oppos[ing] a discriminatory practice." *Id.* § 21.055. The Texas Legislature enacted the TCHRA, in part, to "execut[e] . . . the policies of Title VII of the Civil Rights Act of 1964 and its subsequent amendments." *Id.* § 21.001(1). Consequently, when analyzing a claim brought under the TCHRA, we may look to federal law interpreting analogous Title VII provisions as authority. *In re United Servs. Auto. Ass'n*, 307 S.W.3d 299, 308 (Tex. 2010) (orig. proceeding).

To establish a claim of unlawful discrimination or retaliation under the TCHRA, a plaintiff may rely on either direct or circumstantial evidence. *Alamo Heights*, 544 S.W.3d at 781-82; *Texas Alcoholic Bev. Comm'n v. Moralez,* No. 03-19-00588-CV, 2021 Tex. App. LEXIS 6036, at *20 (Tex. App.—Austin July 29, 2021, no pet.) (mem. op.). Generally, direct evidence is evidence of "what the defendant did and said," *Garcia*, 372 S.W3d at 634, that, without inference or presumption, establishes discriminatory intent, *Jespersen v. Sweetwater Ranch Apts.*, 390 S.W.3d 644, 653-54 (Tex. App.—Dallas 2012, no pet.). Once a plaintiff presents direct evidence, the burden shifts to the employer to show that the same adverse employment decision would have been made regardless of any discriminatory animus. *City of*

16

*Austin Police Dep't v. Brown*, 96 S.W.3d 588, 597 (Tex. App.—Austin 2002, pet. dism'd) (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 244-45 (1989)).

Because "motives are often more covert than overt," making direct evidence of animus hard to come by, a plaintiff may instead establish discrimination or retaliation with circumstantial evidence. *Garcia*, 372 S.W.3d at 634. When a plaintiff relies on circumstantial evidence, we evaluate the plaintiff's claim by applying the burden-shifting framework established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Alamo Heights*, 544 S.W.3d at 782 (explaining that burden-shifting steps apply to retaliation claims). Under this framework, a rebuttable presumption of discrimination or retaliation arises when an employee establishes a prima facie case. *Alamo Heights*, 544 S.W.3d at 781. An employer can defeat this presumption, however, by providing evidence of a legitimate, nondiscriminatory reason for the employment action. *Id.* Finally, "once rebutted, the presumption disappears, and an employee lacking direct evidence cannot prove a statutory violation without evidence that the employer's stated reason is false and a pretext for discrimination." *Id.* Although the burdens of production shift under the framework, the burden of persuasion always remains with the employee. *Id.*

### Circumstantial Evidence of Race Discrimination

AISD argues that the trial court erred in denying its plea as to Anderson's claim of racial discrimination because, it contends, he failed to adequately plead facts establishing a prima facie case and because the undisputed jurisdictional evidence affirmatively negates the existence of a prima facie case.

The precise elements of a prima facie case "vary depending on the circumstances." *Exxon Mobil Corp. v Rincones*, 520 S.W.3d 572, 584 (Tex. 2017). To establish a prima facie case of racial discrimination based on disparate treatment, the plaintiff must show that he (1) is a member of a protected class, (2) was qualified for the position at issue, (3) was subject to an adverse employment action, and (4) was treated less favorably than similarly situated members outside the protected class.[1] *Bedgood v. Texas Educ. Agency*, No. 03-14-00030-CV, 2015 Tex. App. LEXIS 1546, at *4 (Tex. App.—Austin Feb. 19, 2015, pet. denied) (mem. op.) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000); *Ysleta Indep. Sch. Dist. v. Monarrez*, 177 S.W.3d 915, 917 (Tex. 2005)). Here, AISD does not dispute that Anderson was qualified for his position, that he is a member of protected class, or that he was subject to an adverse employment action when he was terminated. Instead, AISD contends that Anderson has failed to affirmatively show that he was treated less favorably than similarly situated members outside of his protected class, the fourth element of a prima facie discrimination case.

"Employees are similarly situated if their circumstances are comparable in all material respects, including similar standards, supervisors, and conduct." *Ysleta Indep. Sch. Dist.*, 177 S.W.3d at 917. In other words, "[t]he situations and conduct of the employees in question must be 'nearly identical.'" *Rincones*, 520 S.W.3d at 584 (quoting *Autozone, Inc. v. Reyes*, 272 S.W.3d 588, 594 (Tex. 2008)). "Employees with different responsibilities, supervisors, capabilities, work rule violations, or disciplinary records are not considered to be

---

[1] A terminated employee can also establish a prima facie case of discrimination by showing that he was replaced by someone outside of his protected class. *See Texas Tech Univ. Health Scis. Ctr.-El Paso v. Flores*, 612 S.W.3d 299, 305 (Tex. 2020). Anderson, who is African-American, has not alleged or pleaded any facts showing that he was replaced by someone who is not African-American.

'nearly identical.'" *Id.* (quoting *Reyes*, 272 S.W.3d at 594). "[O]rdinarily, it will not be the case that a plaintiff is similarly situated to another employee when the plaintiff is subordinate to that employee." *Id.* (quoting *Burks v. Wisconsin Dep't of Transp.*, 464 F.3d 744, 751 (7th Cir. 2006)).

In his pleadings, Anderson states that he is "black-African American," and that he was subject to an "adverse employment action" when he was suspended and then, a few days later, terminated from his employment.[2] Anderson also generally alleges that he was "subjected to racially based disparate treatment," that there was "favoritism for similarly situated Hispanic employees . . . and similarly situated Caucasian or white employees," and that "the actions of the decision makers in his termination were motivated by considerations of his race." However, Anderson does not identify any employees who, in his view, were "similarly situated"; provide any details as to whether such similarly situated employees had similar standards, supervisors, and conduct; or describe how these unidentified employees were treated more favorably by AISD. In short, the factual allegations in Anderson's pleadings, liberally construed and taken as

---

[2] In his petition, and in his response to AISD's plea to the jurisdiction, Anderson recites a list of additional actions that he contends were discriminatory and retaliatory, including (1) being instructed by Assistant Chief Envoy "to write an email outlining his reports regarding Sergeant Herrera's violations"; (2) being "transferred from the North Command to the South Command, increasing the commute from his home . . . by approximately 1.5 hours per day"; and (3) meeting "with Assistant Chief Envoy to discuss his alleged 'performance deficiencies.'" For purposes of discrimination, the TCHRA only addresses "ultimate hiring decisions," such as hiring, granting leave, discharging, promoting, or compensating. *See Bedgood v. Texas Educ. Agency*, No. 03-14-00030-CV, 2015 Tex. App. LEXIS 1546, at *16 (Tex. App.—Austin Feb. 19, 2015, pet. denied) (mem. op.) ; *Ptomey v. Texas Tech Univ.*, 277 S.W.3d 487, 492 (Tex. App.—Amarillo 2009, pet. denied). It does not address "every decision made by employers that arguably might have some tangential effect on employment decisions," such as disciplinary filings, reprimands, poor performance reviews, hostility from fellow employees, verbal threats, or criticism of the employee's work. *Anderson v. Houston Cmty. Coll. Sys.*, 458 S.W.3d 633, 644 (Tex. App.—Houston [1st Dist.] 2015, no pet.). Under this standard, the additional actions recited by Anderson in his pleadings do not qualify as "adverse employment actions" for the purpose of establishing his discrimination claim.

true, fail to show that Anderson was treated less favorably than similarly situated members outside of the protected class.

In addition, we conclude that the jurisdictional evidence, viewed in the light most favorable to Anderson, is insufficient to create a fact issue as to whether he was subjected to disparate treatment because of his race. In his deposition testimony, which AISD submitted in support of its plea, Anderson was questioned about which employees, if any, he believed received more favorable treatment from the AISD Police Department. In response, Anderson identified Assistant Chief Envoy and Sergeant Herrera. As to Envoy, Anderson testified that Envoy received preferential treatment in 2012, when he was promoted to Captain over Anderson. According to Anderson, he was ranked higher than Envoy at the time of the promotion; however, aside from his rank, Anderson provided no other facts suggesting that Envoy was less qualified than Anderson for that position. Moreover, Anderson does not allege in his pleadings that he suffered an adverse employment action when he was not promoted in 2012 nor did he raise this in his complaint with the Texas Workforce Commission (TWC). In light of the amount of time since that promotion decision, we cannot conclude that this evidence is sufficient to create a fact issue as to whether Anderson was subjected to disparate treatment by AISD. *See* Tex. Labor Code § 21.202 (complaint with TWC must be filed not later than 180th day after date alleged unlawful employment practice occurred); *Prairie View A&M v. Chatha*, 381 S.W.3d 500, 513 (Tex. 2012) (concluding that 180-day deadline is jurisdictional prerequisite to suit).

As to Sergeant Herrera, Anderson stated in his deposition that Herrera received preferential treatment because although Herrera had violated Department policies on several occasions, "there was never any action taken." Anderson acknowledged, however, that he and Herrera had different ranks within the Department—Herrera being of a lower rank, Sergeant—

and that Herrera had different supervisors and job standards than he did.  *See Reyes*, 272 S.W.3d at 594 ("Employees with different responsibilities, supervisors, capabilities, work rule violations, or disciplinary records are not considered to be 'nearly identical.'").  In addition, Anderson does not allege, and the evidence does not show, that the Department has ever investigated any claim that Herrera retaliated against a subordinate—the misconduct that Chief Gonzalez asserts was the "final straw" leading to his decision to recommend Anderson's termination.  *See Ysleta Indep. Sch. Dist.*, 177 S.W.3d at 917-18 (explaining that to prove discrimination based on disparate discipline, employee must usually show that misconduct for which he was discharged was nearly identical to conduct engaged in by employee that was retained).  Consequently, the jurisdictional evidence fails to show that Herrera is "nearly identical" to Anderson for the purpose of demonstrating discrimination based on disparate treatment.  *See Rincones*, 520 S.W.3d at 584.

We conclude that Anderson's racial-discrimination claim, as alleged, is insufficient to demonstrate a valid waiver of immunity under the TCHRA.  Moreover, the undisputed jurisdictional evidence submitted by AISD affirmatively negates the existence of a similarly situated employee who received more favorable treatment than Anderson.  As a result, Anderson failed to satisfy his burden to establish a prima facie case of racial discrimination based on disparate treatment, the only theory of discrimination that he has alleged.

### *Direct Evidence of Racial Discrimination*

Although AISD characterizes Anderson's racial-discrimination claim as relying solely on circumstantial evidence, we also consider whether there is direct evidence to support his discrimination claim.  Direct evidence of discrimination is evidence that, if believed, proves the fact of discriminatory intent without inference or presumption.  *Jespersen*, 390 S.W.3d

at 653-54. On the other hand, if an inference is required for evidence to be probative as to the employer's discriminatory animus in making an employment decision, the evidence is circumstantial. *Id.*

Generally, statements that courts have found constitute direct evidence of discrimination are insults or slurs against a protected group. *KIPP, Inc. v. Whitehead*, 446 S.W.3d 99, 107 (Tex. App.—Houston [1st Dist.] 2014, pet. denied); *see Brown v. East Miss. Elec. Power Ass'n*, 989 F.2d 858, 861 (5th Cir. 1993) (noting that "routine use of racial slurs constitutes direct evidence that racial animus was a motivating factor in an employment decision"). However, statements and remarks—including insults and slurs—may serve as direct evidence of discrimination only if they are (1) related to the employee's protected class, (2) proximate in time to the employment decision at issue, (3) made by an individual with authority over the employment decision, and (4) related to the employment decision at issue. *Reyes*, 272 S.W.3d at 593; *see Jackson v. Cal-W. Packaging Corp.*, 602 F.3d 374, 380 (5th Cir. 2010); *Anderson v. Houston Cmty. Coll. Sys.*, 458 S.W.3d 633, 644 (Tex. App.—Houston [1st Dist.] 2015, no pet.). Comments that do not satisfy these four requirements are considered "stray remarks" and insufficient to establish discrimination. *Reyes*, 272 S.W.3d at 592.

In his pleadings, Anderson does not allege that Envoy or Gonzalez made any statements or took any actions that, without inference or presumption, would demonstrate that the decision to terminate Anderson was motivated by his race. However, in support of his response to AISD's plea, Anderson attached his own sworn declaration.[3] In relevant part, Anderson states in his declaration:

---

[3] At the hearing on its plea, and in its reply to Anderson's response, AISD objected to these portions of Anderson's affidavit as inadmissible hearsay. Nothing in the record, however,

> [A]t least three African American students reported to me that Asst. Chief Envoy referred to them as "n*****" while they were in his care, custody, and control. Also, Sergeant Corbet reported Assistant Chief Envoy using the word "n*****" in his presence.

There can be no dispute that these statements, if proven, are offensive racial slurs and that Envoy was Anderson's supervisor and involved with the decision to terminate his employment, even if Gonzalez actually made the decision to recommend termination. *See Russell v. McKinney Hosp. Venture*, 235 F.3d 219 (5th Cir. 2000) ("We therefore look to who actually made the decision or caused the decision to be made, not simply to who officially made the decision."); *Reyes*, 272 S.W.3d at 593 (explaining that "discriminatory animus by a person other than the decision-maker may be imputed to an employer if evidence indicates that the person in question possessed leverage or exerted influence over the decision-maker"). Therefore, whether the statements qualify as direct evidence of discriminatory intent turns on whether they were made at a time proximate to Anderson's suspension and termination in April 2019 and whether they are related to the decision to suspend and then terminate Anderson's employment.

Aside from Anderson's declaration, there is no evidence, including Anderson's own deposition testimony, that Envoy made any racial slurs or other racist statements. In addition, in his declaration, Anderson does not include any factual details about when the alleged statements were made or that otherwise suggest that the statements were made shortly before Anderson's suspension and termination. In other words, there is no evidence showing that the slurs were made "proximate in time to the employment decision at issue." *See Reyes*,

---

shows that AISD obtained a ruling on its objection. *See* Tex. R. App. P. 33.1; *Stone v. Midland Multifamily Equity REIT*, 334 S.W.3d 371, 374 (Tex. App.—Dallas 2011, no pet.) (noting that "[a]n objection that an affidavit contains hearsay is an objection to the form of the affidavit" and that "[t]he failure to obtain a ruling from the trial court on an objection to the form of an affidavit waives the objection").

272 S.W.3d at 593; *Anderson*, 458 S.W.3d at 645 (concluding that evidence that supervisor used racial slur was not direct evidence of discrimination because employee did not "identify an adverse employment action that occurred proximately in time to [supervisor's] use of racial slur" or present evidence "that the comment related to an adverse employment decision"). Similarly, there is no evidence suggesting that the statements were related to Anderson's suspension and termination. *See Reyes*, 272 S.W.3d at 593; *see also Texas Tech Univ. Health Scis. Ctr.-El Paso v. Flores*, 612 S.W.3d 299, 313 (Tex. 2020) (explaining that generally comments about protected status constitute direct evidence of discriminatory intent only if they "are tied to the adverse employment action at issue both in terms of when and by whom they were made") (quoting *Goudeau v. National Oilwell Varco, L.P.*, 793 F.3d 470, 475 (5th Cir. 2015))). We cannot conclude that Anderson's declaration, showing that Envoy used racial slurs at some unknown time in some unknown context, is sufficient to constitute direct evidence of discriminatory intent. Viewing Anderson's declaration in the light most favorable to him, a reasonable fact finder could not conclude without inference or presumption that the decision to suspend and then terminate Anderson's employment was motived by race. *See Jespersen*, 390 S.W.3d at 653-54.

In summary, Anderson has failed to allege facts or present evidence that, if believed, constitutes direct evidence of racial discrimination or, alternatively, to establish a prima facia case of racial discrimination. As a result, Anderson failed to affirmatively demonstrate a valid waiver of immunity under the TCHRA as to his racial-discrimination claim, and the trial court erred in denying AISD's plea to the jurisdiction on this claim.

*Circumstantial Evidence of Retaliation*

AISD argues that the trial court erred in denying its plea to the jurisdiction as to Anderson's claim of retaliation under the TCHRA for two independent reasons. AISD argues that (1) Anderson failed to establish a prima facie case of retaliation, and (2) in the alternative, that it established a legitimate nondiscriminatory reason for Anderson's termination, and he failed to raise a fact issue on whether that reason was a pretext.

To establish a prima facie case of retaliation under Section 21.055, the Act's antiretaliation provision, an employee must show (1) he engaged in an activity protected by the TCHRA, (2) he experienced a material adverse employment action, and (3) a causal link exists between the protected activity and the adverse action. *See* Tex. Lab. Code § 21.005; *Alamo Heights*, 544 S.W.3d at 781 (applying *McDonnell Douglas* framework to retaliation claim under TCHRA and explaining that all aspects of framework are jurisdictional). As to the first element, an employee engages in a protected activity when he, "under this chapter," "opposes a discriminatory practice," "makes or files a charge," "files a complaint," or "testifies, assists, or participates in any manner in an investigation, proceeding, or hearing." Tex. Lab. Code § 21.055. Because sexual harassment is a form of sex discrimination under Title VII and the TCHRA, it is a "discriminatory practice" under Section 21.055, and opposition to sexual harassment is a protected activity. *San Antonio Water Sys. v. Nicholas*, 461 S.W.3d 131, 137 (Tex. 2015). Here, liberally construing Anderson's pleadings, the only potentially protected activity alleged by Anderson was his reporting to the Board of Trustees in his March 2018 letter that Herrera had been accused of sexually harassing a subordinate.[4]

---

[4] To the extent Anderson suggests that AISD retaliated against him for filing a grievance complaining about the Department's handling of the terroristic threat at Akins High School, we

25

In addition, as the second element, the only potential retaliatory action taken by AISD, as alleged by Anderson, occurred when he was transferred to a different work location, suspended for three days, and, shortly thereafter, terminated from his employment. [5] However, in his complaint to the TWC, Anderson stated only that he had been "terminated" "in retaliation for his opposition to unlawful employment actions." As a result, we construe Anderson's retaliation claim as a claim for retaliatory discharge. *See County of Travis v. Manion*, No. 03-11-00533-CV, 2012 Tex. App. LEXIS 4004, at *6 (Tex. App.—Austin May 17, 2012, no pet.) (mem. op.) (explaining that action under TCHRA requires "exhaustion of administrative remedies" and that court will not construe complaint filed with TWC "to include facts that were initially omitted" (quoting *Harris v. David McDavid Honda*, 213 F.App'x 258, 261 (5th Cir. 2006) (per curiam) (not for publication))); *see also* Tex. Labor Code § 21.202 (complaint with TWC must be filed not later than 180th day after date alleged unlawful employment practice occurred).

AISD contends that Anderson failed to establish a prima facie case of retaliation as to the third element because, it asserts, he failed to demonstrate that there is a causal link

disagree that this complaint constitutes activity protected by the TCHRA. The undisputed factual allegations and the jurisdictional evidence establish that the grievance was *not* based on discrimination protected by the TCHRA and that, consequently, the complaint was not "under this chapter." *See Texas Dep't of Transp. v. Lara*, 625 S.W.3d 46, 59 (Tex. 2021) ("[T]o invoke the protections of Section 21.055, the conduct relied on by the employee 'must, at a minimum, alert the employer to the employee's reasonable belief that unlawful discrimination is at issue." (quoting *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 786 (Tex. 2018))).

[5] As previously mentioned, in his petition, Anderson lists other actions taken by AISD that he contends were retaliatory. *See* supra fn.2. The TCHRA, however, does not protect employees from all retaliatory employment actions, only actions that are materially adverse. *Alamo Heights*, 544 S.W.3d at 788. Materially adverse "means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id*. (quoting *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 67-68 (2006)). While the other actions alleged by Anderson may be unpleasant and annoying, they fail to rise to the level of material adversity. *See id.*

between his complaint of alleged sexual harassment in March 2018 and his termination in April 2019. Second, and in the alternative, AISD argues that even if Anderson met his burden to establish a prima facie case of retaliation under the first step of the *McDonnell Douglas* burden-shifting framework, he failed to establish a valid waiver of immunity for his retaliation claim because (1) AISD met its burden under the second step to produce a legitimate, nondiscriminatory reason for terminating Anderson; (2) the burden shifted to Anderson under the third step to raise a fact issue that AISD's stated reason is a pretext and that he would not have been terminated but for his reporting; and (3) Anderson failed to meet this burden.

All three burden-shifting steps of the *McDonnell Douglas* framework are jurisdictional. *Alamo Heights*, 544 S.W.3d at 783-84. Consequently, both of AISD's arguments—one challenging whether Anderson met his burden under the first step, and the other challenging whether Anderson met his burden under the third step—are potentially dispositive of its jurisdictional challenge, and we will begin our analysis by considering AISD's second argument. That is, applying *McDonnell Douglas*, we will assume without deciding that Anderson met his initial burden to establish a prima facie case of retaliation—including the prima-facie-case element of a "causal link between" his complaint of sexual harassment and his termination. In light of this assumption, we will then examine whether AISD met its burden under the second step of the *McDonnell Douglas* framework to produce evidence of a legitimate, nondiscriminatory reason for its actions and, if so, whether Anderson met his burden of raising a fact issue as to whether the stated reason is pretext and that he would not have been terminated but for reporting sexual harassment. *See Bermudez v. Texas Mut. Ins. Co.*, No. 03-17-00687-CV, 2018 Tex. App. LEXIS 7016, at *6-7 (Tex. App.—Austin Aug. 30, 2018, no pet.) (mem. op.) (affirming trial court's dismissal of retaliation claim on summary judgment because, assuming

27

without deciding that plaintiff established prima facie case, plaintiff failed to raise fact issue that defendant's asserted reason was pretext).

**Did AISD show a legitimate, nondiscriminatory reason for terminating Anderson?**

In support of its plea to the jurisdiction, AISD submitted sworn declarations from Assistant Chief Envoy and Chief Ashley Gonzalez. In their declarations, Envoy and Gonzalez detailed the events preceding Chief Gonzalez's recommendation to terminate Anderson for what they describe as "job performance deficiencies."

According to Assistant Chief Envoy's declaration, on March 27, 2019, he sent a memo to Chief Gonzalez concerning Anderson's job performance unrelated to the grievance filed by Herrera. In the memo, a copy of which was submitted by AISD with its plea, Envoy summarizes his concerns with Anderson and then describes four incidents, occurring over the previous twelve months, that illustrate "[Anderson's] inability to lead and manage incidents." For example, Envoy describes an incident that occurred on March 14, 2018, where a parent with a history of violence had threatened to shoot staff at an AISD middle school. After the incident was reported to the AISD Police Department, Assistant Chief Envoy received a call from acting Patrol Supervisor, Corporal Alex Phillips. In the call, Phillips asked Envoy to review the contents of a notification e-mail about the threat that Phillips had drafted. Phillips explained to Envoy that although Anderson had been informed of the threat, he was not available to review the contents of the draft notification e-mail. After a few hours passed without receiving an update about the incident, Envoy decided to call Anderson. Envoy asked Anderson what precautions had been put in place "to ensure the safety of students," and Anderson stated, "he had no updates on the incident."

Envoy also describes in his memo a similar incident that occurred on March 24, 2019. In his memo, Envoy states:

> [T]he department received information regarding an elementary student making social media threats. After receiving an email notification from Sgt. Ty Neal, I contacted Lt. Rodney Anderson and inquired why I was not informed of the incident. When speaking with Anderson, he provided inaccurate information regarding the specific facts involving the investigation, leading me to provide inaccurate information to district administration."

According to Envoy, "It became apparent to me that Anderson was not overseeing this incident, and it was necessary for me to prompt him to take appropriate steps in this incident." Envoy further states in his memo to Gonzalez that on March 26, he met with Anderson and "presented to [him] the areas of concerns and events mentioned in this memo" and that during the meeting "[Anderson] acknowledged his lack of involvement and gave little information."

In his declaration, Chief Gonzalez states that after receiving the March 27 memo from Assistant Chief Envoy, he scheduled a disciplinary hearing with Anderson to discuss the performance issues identified in the memo and "to provide [Anderson] an opportunity to explain his side of the story." The hearing was conducted on March 29, 2019, while the grievance investigation against Anderson was still pending. According to Gonzalez's declaration, "[d]uring the hearing, [Anderson] failed to provide any valid reason for his job performance deficiencies." On April 1, 2019, Chief Gonzalez notified Anderson in writing that he was suspended for three days without pay.

As to the grievance investigation and Maresh's findings, delivered on April 5, 2019, Gonzalez states in his declaration:

The final straw, although certainly not the sole basis for my recommendation of termination, was when I received the investigation summary pursuant to Austin ISD Board Policy DIA (Local), which concluded that [Anderson] retaliated against Sgt. Herrera after Sgt. Herrera filed a grievance against him. . . . Board Policy DIA (Local) prohibits retaliation against an employee who makes a claim alleging to have experienced discrimination or harassment, and I, as the Austin ISD Policy Department's Chief of Police, do not tolerate retaliation in the workplace. . . . Therefore, given [Anderson's] documented job performance deficiencies, coupled with the finding that he retaliated against Sgt. Herrera because he filed a grievance against [him], I placed [Anderson] on administrative leave without pay and recommended that Austin ISD terminate [Anderson's] employment on April 5, 2019, which Dr. Medina approved effective April 10, 2019. . . . In no event did [Anderson's] race or complaints play any role whatsoever in my decision to recommend his termination of employment or another employment related decision.

In short, the evidence submitted by AISD in support of its plea shows that Anderson was suspended and then terminated because, in several instances, he had demonstrated poor job performance in carrying out his duties and because a neutral investigator determined that he retaliated against a fellow officer. We conclude that even if Anderson established a prima facie case of retaliation, AISD met its burden under the second step of the *McDonnell Douglas* framework to show that Anderson was suspended and then terminated for legitimate, nondiscriminatory reasons.

**Did Anderson create a fact issue as to whether AISD's stated reason is a pretext?**

Because AISD successfully rebutted any presumption that it retaliated against Anderson, the burden shifted to Anderson to show that the explanations offered by AISD were not its true reason but were a pretext for retaliation. That is, even assuming Anderson met his burden to establish a prima facie case of retaliation, to defeat AISD's plea, he was required to present evidence showing that he would not have been terminated "but for" his informing the Board of that Herrera has been accused of sexual harassment. *See Alamo Heights*, 544 S.W.3d

30

at 782; *Democratic Schs. Research Inc. v. Rock*, 608 S.W.3d 290, 311 (Tex. App.—Houston [1st Dist.] 2020, no pet.). The but-for causation standard is significantly more difficult to prove than prima facie causation. *Alamo Heights*, 544 S.W.3d at 782.

In evaluating but-for causation evidence, we examine all the circumstances, including the temporal proximity between the protected activity and the adverse action, knowledge of the protected activity, expression of a negative attitude toward the employee's protected activity, failure to adhere to relevant established company policies, discriminatory treatment in comparison to similarly situated employees, and evidence that the employer's stated reason is false. *Id.*; *Moralez*, 2021 Tex. App. LEXIS 6036, at \*22. "Temporal proximity is relevant to causation when it is 'very close.'" *Alamo Heights*, 544 S.W.3d at 790. Here, the undisputed allegations and the evidence show that Anderson was suspended and then terminated approximately one year after his March 2018 letter to the Board of Trustees. There are no allegations or evidence suggesting that Assistant Chief Envoy, Chief Gonzalez, or anyone else involved in Anderson's termination was aware of his anonymous letter to the Board or that they were otherwise aware that Anderson had reported to the Board that Sergeant Herrera had been accused of sexual harassment. Moreover, even if Envoy and Gonzalez were made aware of his letter to the Board, Anderson has not alleged any facts or presented evidence suggesting that Envoy, Gonzalez, or others in the Department expressed a negative attitude toward his informing the Board of the alleged sexual harassment; that the Department failed to adhere to any Department policy when it suspended and then terminated him; or that he was treated differently than similarly situated employees who had not reported sexual harassment. In short, we conclude that the undisputed allegations and the jurisdictional evidence fail to raise a fact question on the jurisdictional issue of whether Anderson would not have been terminated by the

31

AISD Police Department "but for" his informing the Board of Trustees that one his co-workers, Sergeant Herrera, had been accused of sexual harassment.

Assuming without deciding that Anderson met his initial burden under the *McDonnell Douglas* framework to establish a prima facie case of retaliation, he failed to meet his subsequent burden to plead facts or present evidence showing that AISD's stated reasons for suspending and then terminating his employment were pretexual. Therefore, Anderson failed to affirmatively demonstrate a valid waiver of immunity under TCHRA as to his retaliation claim, and the trial court erred in denying AISD's plea to the jurisdiction on this claim.

## CONCLUSION

Because Anderson failed to affirmatively demonstrate a claim for which immunity is waived, we reverse the trial court's order denying AISD's plea to the jurisdiction and render judgment dismissing Anderson's claims for lack of jurisdiction.

_____
Chari L. Kelly, Justice

Before Chief Justice Byrne, Justices Triana and Kelly

Reverse and Dismissed

Filed: August 25, 2022

32